**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALBERT DECOLLI,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>PARAGON SYSTEMS, INC., UNITED STATES MARSHALL'S SERVICE, THE UNITED STATES DEPARTMENT OF JUSTICE,<br><br>　　　　　Defendants. | Civil Action No. 1:19-cv-21192<br><br>(MAS)(TJB)<br><br><br>**RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ON BEHALF OF DEFENDANT PARAGON SYSTEMS, INC.** |

Defendant Paragon Systems, Inc. ("Paragon"), in support of its motion for summary judgment and for its Local Civil Rule 56.1 Statement of Material Facts Not In Dispute, states as follows:

1.　　Paragon is private provider of specialized security services to various federal agencies. (Gardner Dep.[1] 11:12-12:19).

2.　　Paragon employed Plaintiff, beginning in September 2017, as a Court Security Officer ("CSO") assigned to the Mitchell H. Cohen Building and United States Courthouse in Camden New Jersey (the "Camden U.S. Courthouse"), pursuant to a contract that Paragon had with former defendant United States Marshals Service ("USMS"). (Pl. Dep.[2] 24:15-16, 25:22-26:9, 79:4-80:19; Olitt Dec. Ex. E; Gardner Dec.[3] Ex. A).

---

[1] "Gardner Dep." refers to the transcript of the deposition of Bryttany Gardner, conducted on February 24, 2022, a copy of which is attached as Exhibit D to the accompanying Declaration of Lance N. Olitt, Esq. ("Olitt Dec.").

[2] "Pl. Dep." refers to the transcript of the deposition of Plaintiff, conducted on September 17, 2021, a copy of which is attached as Exhibit B to the Olitt Dec.

1

3.      The USMS contract with Paragon (the "USMS Contract") governed the terms of the USMS' engagement of Paragon to provide armed security guard services at courthouses located in the Third Federal Judicial Circuit and certain other circuits. (USMS Contract at B-1, B-2, Gardner Dec. Ex. A).

4.      Prior to Paragon acquiring the USMS Contract, Plaintiff was employed as a CSO by a different company, Akal Security ("Akal"), while the USMS was under contract with Akal for it to provide security at the Camden U.S. Courthouse and other courthouses in the Third Circuit. While employed by Akal, Plaintiff was initially assigned to work at the Federal Courthouse in Philadelphia, Pennsylvania. Because it was an easier commute for him, Plaintiff requested and was granted a transfer to work at the Camden U.S. Courthouse, where he continued to work until and after Paragon acquired the USMS Contract. (Pl. Dep. 24:15-16, 25:22-27:1).

5.      Plaintiff is a white male and 73 years old. (Pl. Dep. 14:13-14).

6.      At all times while working at the Camden U.S. Courthouse, Plaintiff was a member of the United Government Security Officers of America Union (the "Union"). (Pl. Dep. 42:24-43:8).

7.      Pursuant to the USMS Contract, CSOs were deputized as Special Deputy U.S. Marshals with firearms and arrest powers while on duty at their given worksites. (USMS Contract at C.1, C.15.5, Gardner Dec. Ex. A; *see also* 28 C.F.R. § 0.112(c) (Special deputation). When Plaintiff began working as a CSO, he signed a USMS Special Deputation Appointment Oath of Office form. (ECF No. 26-3).

8.      The USMS Contract set forth performance standards that CSOs were required to follow and for Paragon, by its District Supervisor and Contract Manager, to oversee the

---

[3] "Gardner Dec." refers to the accompanying Declaration of Bryttany Gardner.

adherence to those standards and investigate allegations of misconduct. (USMS Contract C.3.4, C.3.5, Gardner Dec. Ex. A).

9. Under the USMS Contract, the USMS *"reserves the right at all times to determine the suitability of any Contractor employee to serve as a CSO*, [District Supervisor], or [Contract Manager]." (Emphasis added). (*Id*. at H.9(b)). That Contract also gave the USMS unfettered discretion to decide that "[a]ny employee provided by the Contractor … that fails to meet the CSO performance standards" "be removed from performing services for the Government under this contract". (*Id*. at H.9(a), (c)). Additionally, if a CSO is under investigation, the USMS retains the right to temporarily remove that individual from performing under the contract. (*Id*. at H.9(c)).

10. Plaintiff's employment with Paragon was also subject to the terms of a collective bargaining agreement between Paragon and the Union (the "CBA"). (Pl. Dep. 195:24-196:13; Olitt Dec. Ex. M).

11. The CBA sets forth what constitutes "just cause" for termination, stating, "Just cause shall include any action or order of removal of an employee from working under the contract by the U.S. Government, or revocation of required CSO credentials by the USMS under the Removal of Contractor Employee provision in Section H-9 of the 3rd Circuit Contract between the USMS and the Company." (CBA Sec. 8.1, Olitt Dec. Ex. A).

12. On or about February 27, 2019, David McClintock ("McClintock"), Paragon's then Contract Manager for the Third Circuit, began an investigation into an anonymous hotline complaint alleging unprofessional conduct and behavior by Calvin Evans, another CSO assigned to work at the Camden U.S. Courthouse. As part of that investigation, McClintock interviewed

all of the CSOs assigned to that courthouse. (McClintock Dep.[4] 10:15-18, 16:19-17:2, 45:18-21; Gardner Dep. 17:16-23, 19:21-25; Olitt Dec. Ex. J).

13. McClintock was previously a police officer with the Delaware River Port Authority of Pennsylvania and New Jersey Police Department, where he ran the Investigative Unit, Internal Affairs, and Investigations for about 20 years, was trained in conducting investigative interviews, including workplace investigative interviews, and was ultimately made Chief of Police. (McClintock Dep. 11:13-15, 26:12-25).

14. During McClintock's investigative interviews with the only two female CSOs assigned to the Camden U.S. Courthouse, Carmen Ruiz ("Ruiz") and Regina Devery ("Devery"), both of those female CSOs complained about Plaintiff, even though he was not initially a reason for the investigation. As a result, McClintock determined the need to also investigate Plaintiff. (McClintock Dep. 44:8-19, 73:22-25; Olitt Dec. Exs. F, G).

15. In her interview with McClintock, CSO Devery stated that Plaintiff would always turn his back to her and refuse to speak with her. (Olitt Dec. Ex. F). CSO Ruiz similarly stated that Plaintiff "is mean and nasty," "turns his back on me and won't talk to me", and that "he said he doesn't have anything to say to women." Ruiz further confirmed to McClintock an incident that McClintock first heard of from CSO Edward Ramos ("Ramos"), when Ramos and Ruiz were in the locker/break room and Plaintiff walked in and took off his pants in front of Ruiz. Ruiz stated how she was "shocked and embarrassed" by this. (*Id.*). Ramos recalled Ruiz leaving the room in embarrassment and him then asking Plaintiff why he took off his pants in front of Ruiz. According to Ramos, Plaintiff responded, ***"Fuck her this is a man's locker room."***

---

[4] "McClintock Dep." refers to the transcript of the deposition of David McClintock, conducted on February 3, 2022, a copy of which is attached as Exhibit C to the Olitt Dec.

4

(Emphasis added). Ramos also stated how both Ruiz and Devery had stated to him how uncomfortable Plaintiff had made them feel when in his presence. (Olitt Dec. Ex. H).

16. On March 7, 2019, Plaintiff met in the USMS office at the Camden U.S. Courthouse with Paragon's then District Supervisor of New Jersey, Ivan Baptiste, a Deputy Marshal, and a Union representative Anthony J Galiazzi. At that meeting, Baptiste notified Plaintiff that he was suspended pending the ongoing investigation. A Suspension Form, signed by Plaintiff at that time, placed him on administrative leave and referred to "Several ongoing incidents" and that the investigation involved "sustained intimidation and harassment of other CSOs in the workplace. Also USMS Performance Standard Violations (PSV). Investigation is ongoing." (Pl. Dep. 105:20-107:6, 109:20-22, 110:17-111:7; McClintock Dep. 35:18-19; Olitt Dec. Ex. P).

17. The decision to suspend Plaintiff pending investigation was made by Bryttany Gardner ("Gardner"), Paragon's Director of the Office of Professional Responsibility ("OPR") (formerly referred to as Human Resources). (Gardner Dep. 10: 12-15; 26:24-27:1).

18. Gardner had responsibilities for overseeing and enforcing all corrective action measures within Paragon to ensure compliance with company, CBA and client policies. (Gardner Dep. 11:5-11).

19. McClintock's investigation of Plaintiff involved his interviewing all of the approximate 24 CSOs assigned to work at the Camden U.S. Courthouse. (McClintock Dep. 43:4-44:7; Olitt Dec. Ex. J). This included Plaintiff, whom McClintock interviewed on March 21, 2019, for about an hour. (Pl. Dep. 121:23-122:21; Olitt Dec. Ex. I).

20. Plaintiff's interview took place when he returned from Florida, having left to vacation there shortly after his suspension. (Pl. Dep. 125:23-126:25). Plaintiff's interview was

also attended by Union President Dominic Bertoldi, Union Shop Steward Gary Thacker, and Paragon's Program Director-Security Operations, Steven Van Sciver ("Van Sciver"). (Pl. Dep. 122:23-123:15; Olitt Dec. Ex. I at PARAGON 000499 and Ex. J at PARAGON 000062).

21. As McClintock detailed in his Final Investigation Report, his interviews of other CSOs disclosed allegations that Plaintiff expressed a disrespect for the female CSOs and that he believed they should not be CSOs or in law enforcement; that he would turn his back to the female CSOs, as well as some male CSOs while on post, effectively giving them the "silent treatment"; and that his demeanor with and failure to speak with or acknowledge the two female CSOs and some male CSOs had created tension, hostility and intimidation in the workplace, with co-workers describing his demeanor as nasty, moody, disruptive, controversial and disgruntled. (Olitt Dec. Ex. J at PARAGON 000059-000062).

22. Another allegation that arose during McClintock's investigative interviews was that Plaintiff was observed at times rolling paper towels into balls of paper and throwing them on the floor in various areas in the Camden U.S. Courthouse and stuffing balls of papers between the elevator interior handrail and wall. According to CSO Ramos, he asked Plaintiff why he was doing these things and Plaintiff responded that the custodial staff "need to clean the place." (*Id*. at PARAGON 000062). According to McClintock's investigation findings, when Plaintiff was out on a Worker's Compensation leave, the situation with the paper balls stopped. (*Id*.).

23. On March 26, 2019, McClintock finalized his Investigation Report and concluded that Plaintiff "is clearly by admission harassing, intimidating and creating a hostile work environment." McClintock also reported that "this should have been addressed a long time ago and stopped." He further concluded that "[t]here is sufficient information to determine that CSO

Albert DeColli violated both Paragon Work Rules and USMS Performance Standards." (McClintock Dep. 43:4-12; Olitt Dec. Ex. J at PARAGON 000062-000063).

24.     By letter dated April 2, 2019, McClintock reported his investigation and findings to USMS Contracting Officer Angelica Spriggs ("Spriggs"), advising that the investigation sustained that Plaintiff violated Paragon Work Rules as well as certain USMS Performance Standards (specifically listed in McClintock's letter), including those prohibiting immoral, dishonest, disrespectful or disgraceful behavior that reflects poorly on the USMS or the U.S. Courts; discrimination or sexual harassment; and abusive or offensive language, intimidation or other disruptive activities. (Gardner Dec. Ex. B).

25.     In his April 2, 2019 letter to Spriggs, McClintock stated, "Paragon proposed discipline is a 21 day disciplinary suspension and transfer to another USMS site or district (undetermined) in the 3rd Circuit."  The letter also pointed out that with Plaintiff having been on suspension during the investigation, Paragon's proposed 21-day suspension would then conclude on April 5, 2019 (a few days later). (*Id.*).

26.     Paragon's recommended 21-day suspension and transfer of Plaintiff was decided by Gardner.  McClintock did not make any recommendation with regard to disciplining Plaintiff. (McClintock Dep. 62:11-17; Gardner Dep. 10:12-15).

27.     Also on April 2, 2019 and by email that McClintock sent that day to various USMS personnel with copies of his investigation report and supporting documentation attached, McClintock advised USMS, "Paragon plans to suspend CSO DeColli for 21 days and transfer him to another USMS site or district in the 3rd Circuit." (McClintock Dec. Ex. C).

28. If the USMS had accepted Paragon's recommendation, Plaintiff would have been placed to work in another courthouse within the Third Circuit after a brief suspension. (Gardner Dep. 55:25-56:6).

29. Available Third Circuit sites for reassigning Plaintiff at that time were in Philadelphia, PA, Wilmington, DE, Trenton, NJ, or Reading, PA. (McClintock Dep. 62:18-63:2).

30. By letter dated April 24, 2019, Spriggs notified Van Sciver that the USMS rejected Paragon's proposed suspension and transfer, and directed that Plaintiff be immediately removed from working under the USMS Contract. Specifically, Spriggs letter stated,

> [T]he USMS ***does not concur*** with Paragon's proposed disciplinary strategy.
>
> Mr. DeColli's behavior reflects poorly on the U.S. Marshals Service and our responsibility to provide security for our judiciary, employees and visitors. Mr. DeColli is perpetuating a misogynistic, toxic culture in the district that is detrimental to the security posture. Mr. DeColli has created a hostile working environment as well as having a profound effect on CSO morale and productivity.
>
> Mr. DeColli has expressed numerous times that he does not respect female CSOs and that females should not be in a law enforcement or CSO position. Mr. DeColli does not speak to or acknowledge his female CSO coworkers and turns his back to female coworkers while on post with them. …Mr. DeColli also removed his trousers in the locker room while a female CSO was present, which was offensive to the female CSO.
>
> Mr. DeColli's actions have undermined the District's confidence and trust in Mr. DeColli's ability to effectively perform his duties as a Court Security Officer. *Effective Immediately*, Mr. DeColli *shall be permanently removed from performing under the USMS contract*.

(Italics and bold in original) (Gardner Dec. Ex. D).

31. Immediately upon Paragon receiving this USMS directive, Gardner of Paragon sent Plaintiff an overnight letter dated April 24, 2019, notifying him:

8

> The US Marshals Service has directed your removal from the contract. Pursuant to section H.9 of the contract, you have the opportunity to appeal this directive. In order to do so you must submit a written response to your Program Manager, Mr. David McClintock, by May 3, 2019. Your program manager will forward your appeal statement to the USMS for consideration.

(Olitt Dec. Ex. Q).

32. On or about May 2, 2019, Plaintiff appealed the USMS directive that he be removed from working under the USMS Contract. That appeal contained primarily a short list of questions, and did not contain any statements of facts or address the substance of the allegations regarding his conduct. (Pl. Dep. 171:23-172:22; Olitt Dec. Ex. K).

33. By letter dated June 6, 2019, Spriggs advised that the USMS denied Plaintiff's appeal and noted that his appeal provided "no additional facts to reconsider our previous remedy" and that "Mr. DeColli did not provide a substantive rebuttal to warrant changing the decision." Spriggs' letter further stated that the USMS "***does not concur*** with Paragon's proposed appeal to reverse DeColli's removal from the contract." (Italics and bold in original). (Gardner Dec. Ex. E).

34. Plaintiff acknowledges the fact that once the USMS directed Paragon that Plaintiff not work under the USMS Contract, Paragon could no longer have Plaintiff work at any site covered by that contract. (Pl. Dep. 192:6-11).

35. Plaintiff testified to needing to work within 30 miles from his home. (Pl. Dep. 54:12-55:1). The Camden U.S. Courthouse is about 19 miles from his home in Clayton, New Jersey, where he lived while working for Paragon and still now lives. (Pl. Dep. 55:4-8; SAC[5] ¶1,

---

[5] "SAC" refers to Plaintiff's Second Amended Complaint [ECF Document 18], a copy of which is annexed as Exhibit A to the accompanying Declaration of Lance N. Olitt, Esq.

9

Olitt Dec. Ex. A). The Philadelphia Federal Courthouse where he worked prior to that is similarly about 24 miles from his home. (Pl. Dep. 55:10-13).

36. After the USMS rejected Paragon's recommended brief suspension and transfer of Plaintiff, Paragon looked elsewhere to see if there was any available position in close enough proximity for Plaintiff that was not subject to the USMS Contract. (Gardner Dep. 44:3-45:1). However, there was no available position less than 100 miles from Plaintiff's home. There was no position in Delaware or New Jersey. Paragon then had a contract with Federal Protective Services ("FPS") for sites in Pittsburg and Harrisburg/Central Pennsylvania, but not for the Philadelphia or surrounding areas. Paragon was also then preparing to start a new contract with FPS in New York City. (Gardner Dep. 45:4-25). Pittsburg is over 300 miles from Plaintiff's home in Clayton, New Jersey. Harrisburg is about 125 miles from Plaintiff's home. New York City is about 100 miles from Plaintiff's home.

37. Plaintiff concedes he does not know of any site or available position of employment with Paragon that was within 100 miles of his home that was not subject to the USMS Contract (Pl. Dep. 193:24-194:10, 195:12-20).

38. In a letter dated July 11, 2019 and received by Plaintiff on or about July 12, 2019, Paragon notified Plaintiff that his employment was terminated due to the fact that the USMS "revok[ed] your access and ability to perform as a Court Security Officer under the USMS-3rd Circuity contract." (Pl. Dep. 187:13-188:11; Olitt Dec. Ex. L).

39. The CBA provides that "Just cause [for termination] shall include any action or order of removal of any employee from working under the contract by the U.S. Government, or revocation of required CSO credentials by the USMS under the Removal of Contractor

Employee provision in … the 3rd Circuit Contract between the USMS and the Company." (Olitt Dec. Ex. M at Sec. 8.1).

40. At his deposition, Plaintiff testified that the Union President explained to him that because the USMS directed his removal from working under the USMS Contract, that was just cause for his termination under the CBA. (Pl. Dep. 197:3-16).

41. Plaintiff acknowledges that if the USMS had accepted Paragon's proposed 21-day suspension and transfer, he would still be working for Paragon. (Pl. Dep. 233:4-11).

42. Plaintiff conceded to this Court that ***"the Marshals Service caused the termination of Mr. DeColli's employment by directing his removal from the USMS Contract."*** (Emphasis added) (Plaintiff's Memorandum of Law in Opposition to Federal Defendants' Motion for Judgment on the Pleadings, ECF No. 32 at 20). ***"USMS, a state actor, directed Paragon to remove Plaintiff from his position at the Courthouse"***. (SAC ¶56).

43. The CBA states that "[t]he 'final decision' on the employee's removal [from the 3rd Circuit Contract] shall be determined by the Government, and the Employer shall be held harmless by the Union and the employee for any further claims made after this final determination." Plaintiff testified that this is why the Union told him there was no point in filing a grievance against Paragon based on his termination. (Olitt Dec. Ex. M at Sec. 8.1).

44. Plaintiff testified that his only basis for his belief that he was discriminated against because of his gender is that two female CSOs made allegations against him and Paragon "believed the two women over me." (Pl. Dep. 229:1-230:3, 230:22-231:2).

45. Plaintiff is not aware of anyone who made a derogatory remark about his being male when he worked at Paragon. (Pl. Dep. 71:10-16).

11

46. At the time Paragon recommended to the USMS that Plaintiff be briefly suspended and transferred, all but two of the CSOs assigned to work at the Camden U.S. Courthouse were male. (McClintock Dep. 73:22-25).

47. Asked at his deposition whether he is aware of any female CSO who engaged in or was accused of behavior comparable to the behavior that he was found to have engaged in and not comparably disciplined, Plaintiff responded, "I don't know of any females that were accused of anything." (Pl. Dep. 230:17-21).

48. At the time Paragon hired Plaintiff he was he was 68 years old. (Pl. Dep. 14:13-14; Olitt Dec. Ex. E at PARAGON 000089, 000094).

49. Plaintiff went through an interview and application process before Paragon hired him. (Pl. Dep. 27:17-18, 79:4-80:19; Olitt Dec. Ex. E).

50. The application materials included a copy of his birth certificate and driver's license, both reflecting his date of birth. (Olitt Dec. Ex. E)

51. When asked at his deposition to state the basis for his claiming that Paragon discriminated against him because of his age, Plaintiff responded, "I am older, and, you know, I've had these two injuries, and I am probably a liability for them at this point." He conceded that no one said anything to indicate that Paragon held any such view, but nevertheless stated, "well, my belief is that they feel - - they felt that I became a liability because of these two injuries." Asked the basis for this "belief," he responded, "Well, they terminated me." He then acknowledged that Paragon only recommended to USMS that he be briefly suspend and transferred. (Pl. Dep. 231:3-232:9). He further concedes that it was the USMS that ***"caused the termination of [his] employment by directing his removal from the USMS Contract."*** (Emphasis added) (Fact 42, *supra*).

12

52. At his deposition, Plaintiff was asked, "do you believe that the findings made by Mr. McClintock were based on your age?" He candidly and unequivocally responded, "*I don't.*" (Emphasis added). (Pl. Dep. 233:17-20).

53. Gardner testified that neither Plaintiff's age nor his gender played any factor in her recommendation that he be briefly suspended and transferred; a recommendation that the USMS nevertheless rejected in favor of its own decision to require Plaintiff's removal from working under the USMS Contract. (Gardner Dep. 55:21-24).

54. Asked whether he is aware of anyone making any derogatory remark about his age when he was at Paragon, Plaintiff could not recall any such remark. He vaguely claimed to recall some younger CSOs, none whom he can identify by name, "in the small talk that goes on," inquire "When are you going to retire? How long do you want to work?" (Pl. Dep. 71:17-72: 22). He also testified to vaguely recalling CSO Ramos making a comment about other older CSOs (not Plaintiff) "tying up the jobs." (Pl. Dep. 73:15-74:2). Plaintiff also testified that CSO Ruiz, at some point commented about another employee who was 75 or 76 years old at the time, asking, "what's this guy doing here? He should be retired. His wife just died". (Pl. Dep. 74:21-25). Besides these few vaguely recalled comments/questions *by co-workers* (not by anyone in a supervisory position), Plaintiff could not recall any other comments that were made during his employment at Paragon and which he considered age-related. (Pl. Dep. 75:16-20).

55. Plaintiff's Complaint alleges, "Upon information and belief, Plaintiff, who was wrongfully accused of lesser infractions, was nonetheless differently and less favorably [*sic*] than two substantially younger CSOs who were accused of 1) domestic violence, and 2) stalking and who are still employed at the Courthouse. Accordingly, Plaintiff alleges his termination was illegally based upon his age." (SAC ¶26, Olitt Dec. Ex. A). In answers to interrogatories,

Plaintiff identified these referenced younger CSOs as Scott DeGregorio ("DeGregorio") and Jerry Parker ("Parker"). (Answer and supplemental answer to Interrogatory No. 7, Olitt Dec. Exs. N, O).

56. DeGregorio was twice suspended by Paragon, once in January 2018 and again in September or October 2018. The first of those suspensions was for abandoning his post and using offensive language with a co-worker. The second suspension was after a temporary restraining order was placed against him following allegations by a female non-employee about conduct outside of the workplace, resulting in his inability to possess a weapon, and the need to remove him from the schedule. (McClintock Dep. 65:8-20, 68:15-23). After the TRO was suspended, USMS required a follow-up investigation, which McClintock conducted. After he sent his findings to Paragon's HR Department, Paragon terminated DeGregorio's employment in December 2018. (McClintock Dep. 66:21-67:8, 67:21-68:14, 70:19-24).

57. Paragon has no record or information regarding any incident of domestic abuse or stalking or similar conduct by Parker during his period of employment with Paragon. (Gardner Dec. ¶4)

Dated: Lincroft, New Jersey
September 15, 2022

Respectfully submitted,

KLUGER HEALEY, LLC

By: _____
Lance N. Olitt, Esq.

521 Newman Springs Road, Suite 23
Lincroft, NJ 07738
Phone: (732) 852-7500
Email: lolitt@klugerhealey.com
Attorneys for Defendant Paragon Systems, Inc.